[Cite as *State v. Gay*, 2013-Ohio-4169.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 26487 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| KENNARD S. GAY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 11 09 2625 |

DECISION AND JOURNAL ENTRY

Dated: September 25, 2013

HENSAL, Judge.

{¶1} Defendant-Appellant, Kennard S. Gay, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On September 10, 2011, Kennard Gay and Melvin "Ben" Coleman were involved in an argument in front of Kelly's Drive Thru on Copley Road in Akron. The two men did not know each other prior to that day. Earlier in the day, Mr. Coleman came to the home of Mr. Gay's mother, Ramona "Mona" White, and accused her of having his missing dog. During the course of the argument, Mr. Gay shot Mr. Coleman three times from approximately three feet away. He claims he was defending himself and his mother when he shot Mr. Coleman. Mr. Coleman died from internal bleeding due to a gunshot wound to his chest. Mr. Gay fled the scene, but turned himself in to the police six days later.

**{¶3}** The Grand Jury indicted Mr. Gay on the following charges: (1) one count of aggravated murder with a firearm specification, (2) one count of murder with a firearm specification, (3) one count of having weapons while under disability, and (4) one count of attempted aggravated murder. In the same indictment, he was also charged with other counts associated with an unrelated incident that occurred on August 18, 2011. Prior to trial, the attempted aggravated murder charge was dismissed, and the charges associated with the August 18th incident were bifurcated to be tried separately from the charges related to the September 10th incident.

**{¶4}** The case proceeded to trial on the aggravated murder with firearm specification, murder with firearm specification, and having weapons while under disability charges. Mr. Gay asserted that the affirmative defenses of self-defense and defense of others precluded his conviction. He was acquitted of the aggravated murder with firearm specification charge, but convicted of the murder with firearm specification and having weapons while under disability charges. The trial court sentenced him to serve the statutorily mandated prison term of 15 years to life for murder, three years for the firearm specification, and three years for having weapons while under disability. Mr. Gay was ordered to serve all imposed terms of incarceration consecutively.

**{¶5}** Mr. Gay filed a timely appeal of his convictions. The bifurcated charges from the August 18th incident are not the subject of this appeal. Mr. Gay raises four assignments of error for our review. This Court rearranges assignments of error numbers one and two to facilitate our analysis.

II.

ASSIGNMENT OF ERROR II

GAY'S MURDER CONVICTION WAS AGAINST THE MANIFEST WEIGHT
OF THE EVIDENCE, AND MUST BE REVERSED.

{¶6}    In Mr. Gay's second assignment of error, he argues that his murder conviction was against the manifest weight of the evidence.  This Court disagrees.

{¶7}    To determine whether Mr. Gay's murder conviction is against the manifest weight of the evidence, this Court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340, (9th Dist.1986).  Weight of the evidence pertains to the greater amount of credible evidence produced in a trial to support one side over the other side. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).  "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id*.

{¶8}    Mr. Gay does not dispute shooting Mr. Coleman.  He maintains that he shot him in self-defense and defense of his mother.  Mr. Gay challenges the credibility of two of the prosecution's witnesses, Terrell "Izzy" Edwards and Deshanna Zanders, whose testimony at trial conflicted on certain points with their initial statements to police.  Mr. Gay testified in his defense, and corroborated Ms. White's version of events.  Mr. Gay argues that it was against the manifest weight of the evidence to discredit his affirmative defenses and convict him of murdering Mr. Coleman given the inconsistent testimony from Mr. Edwards and Ms. Zanders.

{¶9}   In order to succeed on his affirmative defense of self-defense, Mr. Gay had to show by a preponderance of the evidence that:  "(1) he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was in the use of force; and (3) that he did not violate any duty to retreat or avoid danger."  *State v. Inman*, 9th Dist. Medina No. 03CA0099-M, 2004-Ohio-1420, ¶ 8, quoting *State v. Mason*, 9th Dist. Summit No. 21397, 2003-Ohio-5785, ¶ 4.  "If a person in good faith and upon reasonable ground[s] believes that a family member is in imminent danger of death or serious bodily harm, such person may use reasonably necessary force to defend the family member to the same extent as the person would be entitled to use force in self-defense."  *State v. Williford*, 49 Ohio St.3d 247 (1990), paragraph one of the syllabus.

{¶10}   Mr. Gay focuses his argument on the second element of his self-defense/defense of others claim (i.e. "that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was in the use of force.")  *Inman* at ¶ 8, quoting *Mason* at ¶ 4.  "When determining if the second element of self-defense has been proven * * *, the jury must consider all the circumstances to see whether the defendant had an objective reasonable belief of imminent danger and if he possessed a subjective honest belief that he was in danger of imminent harm."  *Inman* at ¶ 9, citing *State v. Thomas*, 77 Ohio St.3d 323, 330-331 (1997).

{¶11}  Deshanna Zanders was Mr. Gay's former girlfriend.  On the day of the shooting, she drove to Ms. White's home to pick up Mr. Gay.  As she walked up to the house, a man on a bicycle, who was later identified as Mr. Coleman, asked if Ms. White was there.  Ms. Zanders told him she did not know and went into the home.  Ms. White, her young daughter, and Mr. Gay

were home at the time. Mr. Gay was asleep in a back bedroom. Ms. Zanders told Ms. White about the man on the bicycle outside.

{¶12} Ms. White testified that Mr. Coleman then pounded on the door. When she opened it, he allegedly threatened her and called her names. According to Ms. White, Mr. Coleman said, "bitch, I'm going to kill you" and "reached like he was about to go up under his shirt for something." Ms. Zanders testified that she was standing in the living room and could hear Mr. Coleman speaking with Ms. White. She further testified that Mr. Coleman asked Ms. White if she had his dog, which Ms. White denied. Ms. White testified that she did not hear Mr. Coleman asking about his dog because he was "babbling on" and "so crazy." Ms. White then slammed the door shut.

{¶13} Mr. Gay woke up when he heard people yelling and the door slam. Ms. White testified that she told Mr. Gay that "someone was just at [her] door threatening [her] life." Ms. White could not recall if she told Mr. Gay that she thought Mr. Coleman had a gun. She asked Ms. Zanders to drive her to see a friend, Izzy Edwards, who owned a t-shirt shop at Kelly's Drive Thru. Mr. Edwards and Mr. Coleman were friends who grew up together. Mr. Coleman lived on the first floor of a building owned by Mr. Edwards. Ms. White wanted to tell Mr. Edwards about "the man who threatened [her] life" to find out his real name so that she could call the police. Ms. White said she was "terrified" after the encounter with Mr. Coleman. Mr. Gay went with Ms. Zanders and his mother to see Mr. Edwards. He took a gun with him to Kelly's Drive Thru as he "was going up there with two females and [he] wanted to protect them if [he] had to." He described the neighborhood as "terrible," full of crime including murder, violence and guns, and where the people are "just out of control."

{¶14} Surveillance video of the scene showed that Ms. White entered the store and exited a short time later. She jogged back to Ms. Zander's car with Mr. Edwards following behind her. Ms. White claims she ran back to the car because she was scared due to the incident with Mr. Coleman. Mr. Gay and Ms. Zanders remained in the car while Ms. White and Mr. Edwards talked outside the driver's side front window of the car. Ms. White testified that she told Mr. Edwards that Mr. Coleman "had threatened her life again, for the second time, and [she] wanted his name so [she could] call the police." As Ms. White and Mr. Edwards conversed, Mr. Coleman and another individual walked across the street and approached the car.

{¶15} As Mr. Coleman approached, Ms. White testified that she moved toward the rear of the car because she was afraid of Mr. Coleman. At this point, Mr. Gay exited the front passenger side of the car with a gun in his hand. Mr. Gay described Mr. Coleman as having a "look on his face, had his hand in his pocket, he kind of made me feel like he was going to attack my mother or something like that." He had the gun out because he was unsure if Mr. Coleman was holding onto a gun in his pocket and because his mother looked scared. Mr. Gay put the gun back in his pocket when he saw that Mr. Coleman did not have a gun in his hand.

{¶16} An argument ensued between Ms. White and Mr. Coleman over the whereabouts of his dog. Ms. White testified that she feared Mr. Coleman throughout the whole exchange, although video of the altercation demonstrated that she was within arms-length of him during the incident. The video reflected that during the argument, when Mr. Coleman stepped up close to Mr. Gay, Mr. Gay put his arm out in front of him to keep Mr. Coleman away from him. Mr. Gay testified that he tried to persuade Mr. Coleman and his mother to calm down.

{¶17} The argument continued to escalate when according to Mr. Gay, Mr. Coleman then allegedly stated, "that bitch, I fuck her up." Ms. White testified that Mr. Coleman said,

"bitch, I am going to kill you and fuck * * * you up" and that "it ain't over." Mr. Edwards then pushed Mr. Coleman away from Ms. White. Mr. Gay testified that Mr. Coleman kept reaching around his belt area and then behind his back, which he "automatically assumed [meant] he was reaching for a gun." Mr. Gay told Mr. Coleman to leave, and Ms. White testified that Mr. Coleman made a reaching movement around his pockets and the edge of his shirt. She was not sure if she saw Mr. Coleman flash a gun. Mr. Edwards testified that Mr. Coleman did not say anything to Mr. Gay to threaten him.

{¶18} Mr. Gay testified that he thought that Mr. Coleman was going to shoot him and Ms. White. The reason Mr. Gay shot Mr. Coleman, according to Mr. Gay, was because he reached behind his back and threatened Ms. White more than once. There was no evidence produced during trial that Mr. Coleman had a gun or any other weapon on his person at the time of the shooting. Toxicology tests conducted on Mr. Coleman after the shooting established that his blood alcohol level was .275, thus indicating he was very intoxicated.

{¶19} Video surveillance of the scene with multiple camera angles was shown during the trial. The videos were not equipped with sound so as to confirm what was said, when or by whom. Due to the angle and distance, it is unclear whether Mr. Coleman was making any type of reaching movement just before he was shot.

{¶20} On the day of the shooting, Detective David Garro transported Mr. Edwards to the station to be interviewed and recorded the conversation with him in the car. Mr. Edwards stated that he heard Mr. Coleman say during the altercation that "[t]his isn't over" or "this is far from over." He described Mr. Coleman as "antsy" right before the shooting. Mr. Edwards was shown a photo array, which included a picture of Mr. Gay. At that time, he did not identify anyone from the array as the person who shot Mr. Coleman.

{¶21} Mr. Edwards was interviewed a second time the day after the shooting by Detective Garro and another detective. This time, he identified Mr. Gay as the shooter. He said he did not want to identify him the day before because he was scared. He again stated that Mr. Coleman was "antsy" on the day of the shooting. Mr. Edwards also told the detectives that there was a confrontation between Mr. Coleman and Ms. White about one month before the shooting. He further stated that when Ms. White came to speak with him at Kelly's Drive Thru on the day of the shooting, she told him about that day's earlier incident on her porch involving Mr. Coleman. According to Mr. Edwards, Ms. White described Mr. Coleman as antsy and stated that he reached behind his back during the incident on her porch.

{¶22} At trial, Mr. Edwards did not recall telling Detective Garro about the confrontation between Ms. White and Mr. Coleman that allegedly occurred one month prior to the shooting. He also did not recall saying that Ms. White told him Mr. Coleman was antsy and reached behind his back when he came to her house right before the shooting.

{¶23} Ms. Zanders was also interviewed by the Akron Police after the shooting. According to the detective who interviewed her, Ms. Zanders stated she heard Ms. White tell Mr. Edwards that Mr. Coleman was threatening her. Ms. Zanders was able to relay information about what was said during the altercation at Kelly's Drive Thru because the passenger side door was open when Mr. Gay exited the car and her driver's side window was cracked.

{¶24} At trial, however, Ms. Zanders could not recall if she heard Ms. White tell Mr. Edwards that Mr. Coleman threatened her. This was despite the fact that surveillance video of the scene showed that Mr. Edwards was bent over and leaning into her car window while he was speaking to Ms. White. She also testified that she could not hear the argument that ensued

between Ms. White and Mr. Coleman outside her car as her window was rolled up. The video, however, demonstrated that her window was not rolled up.

{¶25} There is conflicting testimony about what both Mr. Coleman and Ms. White said and did during their confrontation. There is also a conflict in the testimony regarding whether Ms. White told Mr. Edwards that Mr. Coleman threatened her earlier that day. While Ms. White and Mr. Gay contend Mr. Coleman reached as if for a gun, Mr. Edwards maintains that Mr. Coleman did not appear to him to be reaching for a gun. The incident itself was captured on surveillance video, but it is unclear from the camera angles whether Mr. Coleman made a reaching movement.

{¶26} "[A] jury is free to believe or reject the testimony of each witness, and issues of credibility are primarily reserved for the trier of fact." *State v. Miles*, 9th Dist. Summit No. 26187, 2012-Ohio-2607, ¶ 24, quoting *State v. Rice*, 9th Dist. Summit No. 26116, 2012-Ohio-2174, ¶ 35. "A conviction is not against the manifest weight because the jury chose to credit the State's version of the events." *State v. Minor*, 9th Dist. Summit No. 26362, 2013-Ohio-558, ¶ 28, quoting *State v. Breneman*, 9th Dist. Wayne No. 11CA0039, 2012-Ohio-3632, ¶ 9. Further, this Court notes that the jury not only had witness testimony to consider when reaching its decision, but also the jury had the video of the incident to help it resolve any issues of credibility or inconsistencies in the witness' testimony. Based on a careful review of the record, this Court cannot conclude that the jury lost its way in rejecting Mr. Gay's affirmative defenses. Accordingly, Mr. Gay's conviction is not against the manifest weight of the evidence. His second assignment of error is overruled.

ASSIGNMENT OF ERROR I

KENNARD GAY WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT GRANTED THE STATE'S MOTION IN LIMINE TO EXCLUDE EVIDENCE THAT, BEFORE SEPTEMBER 10, 2011, MELVIN COLEMAN HAD THREATENED GAY'S MOTHER WITH A GUN, AND THAT COLEMAN HAD BEEN JAILED IN CONNECTION WITH POSSESSING A GUN.

**{¶27}** In his first assignment of error, Mr. Gay argues that he was denied a fair trial when the court granted the prosecution's motion in limine, which excluded evidence of the reason Mr. Coleman was in jail prior to his death. This Court disagrees.

**{¶28}** "A motion in limine 'is a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury.'" *State v. Echard*, 9th Dist. Summit No. 24643, 2009-Ohio-6616, ¶ 3, quoting *State v. Grubb*, 28 Ohio St.3d 199, 201 (1986). This Court is not required to decide whether a trial court's order granting or denying a motion in limine is proper if the claimed error is not preserved by objection, proffer, or ruling on the record at the pertinent part during the trial. *State v. Bobo*, 9th Dist. Summit No. 21581, 2004-Ohio-195, ¶ 5. In order to properly preserve any objection for appellate review, "[a]t trial, it is incumbent upon a defendant, who has been temporarily restricted from introducing evidence by virtue of a motion in limine, to seek the introduction of the evidence by proffer or otherwise in order to enable the court to make a final determination as to its admissibility * * *." *Grubb* at paragraph two of the syllabus.

**{¶29}** Prior to opening statements, the prosecution made an oral motion in limine to preclude testimony that Mr. Coleman was in jail for carrying a concealed weapon. Mr. Gay opposed the motion. He argued that the testimony would show that there was a separate altercation between Mr. Coleman and Ms. White weeks prior to the shooting, wherein Mr.

Coleman allegedly reached for a gun he was carrying and threatened to kill her. Mr. Coleman was arrested sometime after this altercation for carrying a concealed firearm, and spent ten days in jail before being released on bond the day prior to the shooting. It does not appear from the record that Mr. Coleman's confinement arose out of this first altercation with Ms. White.

{¶30} The court granted the prosecution's motion, and excluded testimony about the reason that Mr. Coleman was in jail (i.e. for carrying a concealed weapon). The court later clarified that, "[the] defense is going to be permitted to talk about the victim being in jail during his opening statement, * * * however, not why he was in jail; and the Court will make a determination on the admissibility of that particular issue on a witness-by-witness basis depending on what comes out in the testimony."

{¶31} Contrary to Mr. Gay's assertion, the prosecution's motion in limine did not seek to exclude testimony about the altercation between Ms. White and Mr. Coleman prior to the day of the shooting. The subject was discussed on the record after the prosecution made its motion in limine. The court stated that:

> I think you are treading dangerously close to specific instances and conduct that are not admissible. Part of this I really can't make a decision about until I hear what the testimony is going to be. So I guess I'm just going to go on a witness-by-witness basis. In terms of the fact that he was in jail for having a gun, I'm going to exclude that. In terms of the other things, I'll just take it as it goes.

Mr. Gay's counsel further argued that evidence of this altercation "goes to the credibility of our defense" and the credibility of Ms. White. The Court further stated that, "[w]e will see where the witnesses go on this." Mr. Gay's contention that the trial court's ruling on the motion in limine prevented him from introducing evidence of this altercation is misplaced. The court did not make a ruling prohibiting Mr. Gay from introducing such evidence.

**{¶32}** Further, while Mr. Gay objected to the trial court's initial ruling on the motion in limine, he failed to introduce evidence of the reason Mr. Coleman was in jail by "proffer or otherwise" so as to preserve his objection for appellate review. Absent plain error, Mr. Gay has, therefore, forfeited appellate review of the trial court's decision on the prosecution's motion in limine. *Grubb*, 28 Ohio St.3d 199 at paragraph two of the syllabus.

**{¶33}** "[A] * * * forfeiture does not extinguish a claim of plain error under [Criminal Rule] 52(B)." *State v. Hoang*, 9th Dist. Medina No. 11CA0013-M, 2012-Ohio-3741, ¶ 21, quoting *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 23. Mr. Gay concedes in his brief that the plain error standard is applicable to this assignment of error. Rule 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "To constitute plain error, the error must be obvious and have a substantial adverse impact on both the integrity of, and the public's confidence in, the judicial proceedings." *Hoang* at ¶ 21. This Court "must take notice of plain error only with the utmost caution, and only then to prevent a manifest miscarriage of justice." *Id.* In order to find that the trial court committed plain error in granting the prosecution's motion in limine, Mr. Gay must establish that the result of his trial would clearly have been different but for the exclusion of the testimony about the reason Mr. Coleman was in jail. *Id.* ("This Court may not reverse the judgment of the trial court on the basis of plain error, unless [the defendant] has established that the outcome of the trial clearly would have been different but for the alleged error").

**{¶34}** Mr. Gay asserts that evidence of the reason for Mr. Coleman's recent jail confinement, coupled with testimony about the altercation between his mother and Mr. Coleman prior to the day of the shooting, was relevant to demonstrate Mr. Gay's state of mind at the time of the shooting. Rule of Evidence 401 defines "[r]elevant evidence" as "evidence having any

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Given Mr. Gay's affirmative defenses, evidence of Mr. Coleman's alleged previous threat toward Ms. White and the reason for Mr. Coleman's recent confinement was relevant. Despite the court's assertion that it would determine the admissibility of evidence on a witness-by-witness basis, the record is devoid of any attempt on the part of Mr. Gay to develop such evidence through direct or cross-examination.

{¶35} After carefully reviewing the record, this Court cannot conclude that the trial court committed plain error in granting the prosecution's motion in limine. Mr. Gay's first assignment of error is overruled.

ASSIGNMENT OF ERROR III

GAY WAS DENIED A FAIR TRIAL THROUGH THE PRESENTATION OF REPETITIVE, GRUESOME PHOTOGRAPHS FROM COLEMAN'S AUTOPSY.

{¶36} Mr. Gay argues that he was denied a fair trial because the jury was repeatedly shown the same graphic photograph of Mr. Coleman's body lying on the autopsy table. He maintains that this repeated photograph was unduly prejudicial to him and that it had no probative value given that he did not dispute how Mr. Coleman died. This Court disagrees.

{¶37} The admission of evidence is left to the broad discretion of a trial court. *State v. Gray*, 9th Dist. Wayne No. 08CA0057, 2009-Ohio-3165, ¶ 5, citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). This Court reviews evidentiary rulings under an abuse of discretion standard. *Gray* at ¶ 5. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). In reviewing the trial court's decision pursuant to an abuse of discretion standard, this Court is not

to substitute its judgment for that of the trial court. *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990).

{¶38} "When considering the admissibility of photographic evidence under Evid.R. 403, the question is whether the probative value of the photographic evidence is substantially outweighed by the danger of unfair prejudice to the defendant." *State v. Morales*, 32 Ohio St.3d 252, 257 (1987). "The mere fact that [a photograph] is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury." *State v. Likosar*, 9th Dist. Medina No. 03CA0063-M, 2004-Ohio-114, ¶ 22, quoting *State v. Woodards*, 6 Ohio St.2d 14, 25 (1966). "While it is true that the sheer number of photographs admitted may constitute error where they are needlessly cumulative, * * * the mere fact that there are numerous photos will not be considered reversible error unless the defendant is prejudiced thereby." *State v. Feaster*, 9th Dist. Summit No. 24367, 2009-Ohio-2558, ¶ 24, quoting *State v. Davis*, 9th Dist. Lorain No. 88CA004390, 1990 WL 49985, *24 (Apr. 18, 1990).

{¶39} At trial, the Summit County chief duty medical examiner testified as to the cause and manner of Mr. Coleman's death. During his testimony, the medical examiner testified with the aid of a PowerPoint presentation that contained one particular photograph of Mr. Coleman's body taken during the autopsy with demonstrative arrows superimposed to show the location and path of the bullets. The photo shows Mr. Coleman's body lying prone on a table, his eyes are open and his wounds are visible and referenced in various ways by the superimposed arrows. This image is repeated 12 times during the presentation.

{¶40} Mr. Gay's counsel objected to the presentation being shown to the jury during the medical examiner's testimony. The trial court overruled the objection. The prosecution stated

during his questioning of the medical examiner that, "I guess I would say for the Judge and the jury, certainly this presentation is just for demonstrative, it is not to be put into evidence." Upon admission of the prosecution's exhibits, however, the State moved to submit a copy of the PowerPoint presentation into the record rather than the actual photographs. The attorneys agreed to the removal of two photographs from the presentation, but Mr. Gay's attorney objected on the basis that the remaining images were repetitive, graphic and served no other purpose than to inflame the jury. The trial court overruled the objection, and noted that the photographs were not unusual in cases that involved an autopsy report. The trial court also noted that because Mr. Gay had not yet testified, there conceivably could be an issue about the position and direction of the parties during the incident. The images, the court surmised, would then be useful to the jury for purposes of clarification.

{¶41} We cannot conclude that the trial court abused its discretion in admitting the PowerPoint presentation. Although Mr. Gay did not deny shooting Mr. Coleman, he did raise a claim of self-defense. The medical examiner testified about the probable positions of the shooter and victim based on his clinical examination of Mr. Coleman. The images in the presentation illustrated the medical examiner's testimony in this regard. The probable positions of Mr. Gay and Mr. Coleman were relevant to Mr. Gay's claim of self-defense. The images were not duplicative because they depicted different illustrations of the path that the bullets travelled through Mr. Coleman's body, from which the medical examiner gleaned his determination of the probable positions of Mr. Gay and Mr. Coleman. *See Feaster*, 2009-Ohio-2558 at ¶ 26.

{¶42} In addition, Mr. Gay was on trial for not only murder, but also aggravated murder. This charge would require the prosecution to prove that Mr. Gay purposely caused Mr. Coleman's death with prior calculation and design. R.C. 2903.01(A). These photographs were

probative of the purposefulness of the shooting, especially given the fact that the medical examiner testified that three shots were fired from within three feet away. *See Feaster* at ¶ 26.

{¶43} Based on the foregoing, Mr. Gay was not denied a fair trial when the trial court admitted the PowerPoint presentation photographs into evidence. Mr. Gay's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

GAY WAS DENIED A FAIR TRIAL DUE TO NUMEROUS, CUMULATIVE INSTANCES OF PROSECUTORIAL MISCONDUCT.

{¶44} Mr. Gay maintains that the prosecution engaged in numerous individual incidents of improper conduct that, when taken together, deprived him of a fair trial. This Court disagrees.

{¶45} "In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced." *State v. Sauto*, 9th Dist. Summit No. 26404, 2013-Ohio-1320, ¶ 37, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). If the prosecutorial misconduct deprives the defendant of a fair trial, the judgment may be reversed. *Sauto* at ¶ 37, quoting *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6. "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶46} In the first instance, Mr. Gay alleges that the prosecutor sought a legal opinion from an Akron Police detective who was not qualified to give an opinion under Evidence Rule 702. The detective was questioned about the various individuals he talked to during the investigation. The prosecutor asked, "[d]id any of these people ever describe to you an action

that would have resulted in self-defense?" Mr. Gay's counsel objected, which was overruled by the trial court. The detective answered, "[n]o."

{¶47} The prosecution's question was not improper. While the term "self-defense" has a legal connotation, it also has a more colloquial meaning common in everyday conversation. From the record, it appears the question implied the everyday meaning of the term "self-defense" rather than the specific legal meaning. The detective was not asked to testify based on his law enforcement experience whether he would have shot Mr. Coleman in self-defense as in *State v. Johnson*, 10th Dist. Franklin No. 02AP-373, 2002-Ohio-6957, ¶ 30-40 (finding that police officers' opinion testimony was improper and affected the substantial rights of defendant's self-defense claim). The detective was also not asked to provide an opinion as to whether Mr. Gay acted in self-defense. Use of a generic, everyday term is not improper. *State v. Geboy*, 145 Ohio App.3d 706, 718 (3d Dist.2001) (use of generic terms such as "incest," "abuse," and "molestation" to describe alleged conduct when questioning witnesses was not improper).

{¶48} Mr. Gay next maintains that the prosecutor belittled Ms. White during her testimony. He alleges that the prosecutor yelled at her while she was on the stand, "badgered her" and did not allow her to finish her answers to questions that he posed. Upon Mr. Gay's objection, the court instructed the prosecutor to allow Ms. White to finish her answers and to refrain from yelling given his physical proximity to the witness. This Court does not find that the prosecutor rose to the level of impropriety envisioned to give rise to a new trial.

{¶49} Mr. Gay also alleges that the prosecutor belittled him and made numerous allegedly improper comments during his testimony. During Mr. Gay's cross-examination, the prosecutor commented that, "[he must] have been living under a rock or something" when Mr. Gay testified that he did not know he had a right to defend himself.

{¶50} Because Mr. Gay did not object to the prosecutor's "living under a rock" comment on the basis that the statement was improper, Mr. Gay has waived all but plain error. *Diar*, 2008-Ohio-6266 at ¶ 139. Rule 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "To constitute plain error, the error must be obvious and have a substantial adverse impact on both the integrity of, and the public's confidence in, the judicial proceedings." *Hoang*, 2012-Ohio-3741 at ¶ 21. This Court is not persuaded that the prosecutor's isolated comment, which has no bearing on the facts of the case, constituted prosecutorial misconduct under the plain error standard.

{¶51} During Mr. Gay's cross-examination, his counsel objected to a question on the basis that the prosecutor was attempting to "put[] words in his mouth." The prosecutor stated that, "I'm saying what the truth is." Defense counsel objected again. The trial court overruled all the defense objections, and instructed the jury to "disregard the last comment from the prosecutor." A few questions later, when Mr. Gay testified that he fled the scene because he was scared of the police, the prosecutor stated:

Q:     Because maybe you're guilty?

[Defense]: Objection, your Honor.

Q:     We call that guilty conscience.

[Defense]: Objection.

THE COURT: Sustain as to the first one, overruled as to the second.

{¶52} This Court finds that the "[w]e call that guilty conscience" comment is not improper as it is "well established that evidence of flight is admissible to show 'consciousness of guilt.'" *State v. Brady*, 9th Dist. Summit No. 22034, 2005-Ohio-593, ¶ 9, citing *State v. Eaton*,

19 Ohio St.2d 145 (1969), paragraph six of the syllabus. The prosecutor's comment, therefore, is a correct statement of the law.

{¶53} However, this Court finds that the "I'm saying what the truth is" and "[b]ecause maybe you're guilty" comments are improper as they directly infer that the prosecutor's opinion is that Mr. Gay is lying and that he is guilty. *State v. Gatt*, 9th Dist. Medina No. 10CA0108-M, 2011-Ohio-5221, ¶ 18 (although not reversible error, prosecutor's comments regarding personal belief on credibility of witnesses, including during cross-examination of defendant, were inappropriate). It is well settled that the prosecutor may not articulate to the jury his personal belief or opinion regarding the guilt of the accused. *State v. Lott*, 51 Ohio St.3d 160, 166 (1990). In both instances, however, the court sustained the defense's objections, and gave a curative instruction on the "I'm saying what the truth is" comment. Although finding that the prosecutor's comments were improper, there is no evidence that these singular comments combined to prejudice any of Mr. Gay's substantial rights. *Smith*, 14 Ohio St.3d at 14.

{¶54} Mr. Gay also challenges the prosecution's characterization of the way he held the gun as "gangster style." During Ms. White's questioning, the prosecutor stated that, "[y]our son shoots once, twice, three times, the third time gangster style. Didn't he shoot gangster style right there?" The defense objected, and the prosecution further stated, "[t]urn the gun over the side like this?" The court sustained the objection. Mr. Gay argues that the use of the term "gangster style" was an attempt by the prosecution to portray him as a "thug," which unfairly prejudiced him with the jury. He further argues that the trial court did not give the jury a curative instruction to disregard the prosecution's question.

{¶55} The record reflects that Ms. White never answered the question, and the prosecution moved on to other questions. In reviewing the full record, there is no indication that

the prosecution attempted to label Mr. Gay as belonging to a gang.  Further, the jury was able to view how Mr. Gay held the gun in the surveillance video of the shooting.  The prosecution's comment, therefore, was not improper.  Even if it was improper, Mr. Gay has failed to demonstrate how the  use of the term "gangster style" prejudiced any of his substantial rights when the jury had the opportunity to view the video of the shooting and observe how he held the gun.

{¶56}  Finally, Mr. Gay argues that the prosecution made numerous improper statements during closing argument, including that testimony allegedly favorable to him was false, again described the way he held the gun on the third shot as "gangster style," and stated that "flight is consciousness of guilt."   As the defense did not object to these allegedly improper comments, this Court reviews the comments under the plain error standard.  *Diar*, 2008-Ohio-6266 at ¶ 139.  "As notice of plain error is to be taken with utmost caution and only to prevent a manifest miscarriage of justice, the decision of a trial court will not be reversed due to plain error unless the defendant has established that the outcome of the trial clearly would have been different but for the alleged error."  *State v. Veal*, 9th Dist. Summit No. 26005, 2012-Ohio-3555, ¶ 18.

{¶57}  "[W]e need not decide the propriety of the prosecution's remarks, as [Mr. Gay] has failed to demonstrate that the outcome of the case would clearly have been different but for the alleged improper remarks * * *."  *Id*. at ¶ 22.  The jury listened to the testimony of numerous witnesses, including Gay himself, and viewed surveillance video of the shooting.  In light of the testimony and evidence produced against him at trial, this Court is not persuaded that the outcome of the case would have been any different absent the prosecutor's comments in closing argument.

**{¶58}** This Court finds that the cumulative effect of the statements this Court found to be improper did not substantially prejudice his rights and deny him a fair trial. *Smith*, 14 Ohio St.3d at 14. Accordingly, Mr. Gay's fourth assignment of error is overruled.

III.

**{¶59}** The trial court did not deny Mr. Gay a fair trial, and his conviction was not against the manifest weight of the evidence. Appellant's assignments of error are overruled, and the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

BELFANCE, P. J.
CONCURRING IN JUDGMENT ONLY.

{¶60} I concur in the majority's judgment. With respect to Mr. Gay's fourth assignment of error, I agree that it is properly overruled despite numerous instances of improper comments and questions by the prosecutor. Thus, I share in the concerns expressed in Judge Carr's separate opinion. Additionally, I would conclude that other conduct by the prosecutor was improper. For example, the prosecutor's comments that Ms. White was lying were improper as they invaded the province of the jury by essentially expressing the prosecutor's personal beliefs with respect to Ms. White's credibility. *See State v. Novotny,* 9th Dist. Summit. No. 26526, 2013-Ohio-2321, ¶ 24-26 (Belfance, P.J., concurring in judgment only). Ms. White never admitted to lying, and, thus, the truthfulness of her statements should have been solely evaluated by the jury. *See id.* Nonetheless, because Mr. Gay did not establish prejudice, I agree that the argument is properly overruled.

CARR, J.
CONCURRING IN JUDGMENT ONLY.

{¶61} I agree with the majority's resolution of the appeal. I concur in judgment only regarding the disposition of a portion of the fourth assignment of error.

{¶62} The majority concludes that the prosecutor's question to an Akron police detective whether any person described, for purposes of the investigation, any actions "that would have resulted in self-defense" was not improper. The majority reasons that the prosecutor impliedly sought a response within the context of "the everyday meaning" of the term "self-defense." I disagree. Self-defense is a legal defense and necessarily implicates a legal definition. The majority does not explain the "everyday meaning" of the term. One either has a

legal justification for using force against another or one does not. In my opinion, the prosecutor could only have been asking for a legal conclusion. However, it is the duty of the court, not lay witnesses, to instruct the jury as to the definitions of legal terms which the jury must apply to the facts to reach a verdict. The prosecutor's question, therefore, improperly elicited a legal conclusion from the detective in contravention of these conventions. Nevertheless, I do not believe that Gay has shown that, "but for the prosecutor's misconduct, the jury would not have convicted him." *See State v. Carano*, 9th Dist. Summit No. 26544, 2013-Ohio-1633, ¶ 20. Accordingly, I concur in the majority's opinion.

APPEARANCES:

JACQUENETTE S. CORGAN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.